IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF | ) | |
| AMERICA, INC., ALAN L. MILLER | ) | |
| JONATHAN BLAIR GARBER, | ) | |
| and KEVIN P. STANTON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.  08 CV 3693 |
| | ) | |
| CITY OF EVANSTON, and | ) | Judge Aspen |
| LORRAINE H. MORTON, Mayor, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF MOTION FOR RECUSAL

Plaintiffs, NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., ("NRA") JONATHAN BLAIR GARBER ("Garber"), ALAN L. MILLER ("Miller") and KEVIN P. STANTON ("Stanton") (collectively "Plaintiffs"), request that Judge Marvin E. Aspen recuse himself from the above captioned matter.[1]  Recusal is appropriate pursuant to both 28 U.S.C. §455(a) as well as §455(b)(1).

### Factual Background

The present action concerns Evanston's handgun prohibitions and Plaintiffs' constitutional and statutory challenges to those regulations.  Evanston prohibits possession of a handgun: "[n]o person shall possess, in the City of Evanston any handgun, unless the same has been rendered permanently inoperative."  Evanston City Code, § 9-8-2.  "HANDGUN: Any

---

[1]    Plaintiffs note that they have simultaneously filed a Motion for Finding of Relatedness and for Reassignment and Consolidation pursuant to L.R. 40.4 with respect to two associated cases, *National Rifle Assoc. of America, Inc., Patrick C. Kansoer, Sr., Donald W. Sonne and Jessica L. Sonne v. Village of Morton Grove, and Richard Krier, President,* No. No. 08 CV 3694 and *National Rifle Assoc. of America, Inc., Robert Klein Engler, and Dr. Gene A. Reisinger v. Village of Oak Park and David Pope, President,* No. 08 CV 3696.  Even though the present matter bears the lowest case number, that Motion was filed before the Court hearing the *Morton Grove* case given the pendency of this Motion.

firearm which: a) is designed or redesigned or made or remade, and intended to be fired while held in one hand or b) having a barrel of less than ten inches (10") in length or c) a firearm of a size which may be concealed upon the person." § 9-8-1. Violation is a misdemeanor punishable by fine of not less than $1,500 and/or incarceration for up to six months. § 9-8-6(A). Any handgun is to be confiscated and destroyed. § 9-8-6(B). The restriction has certain exceptions.

But for Evanston's handgun prohibition, Garber, Miller, Stanton and members of the NRA would lawfully obtain handguns to keep at home for lawful self-protection. (Complaint, ¶¶ 16-19). Because of the Evanston handgun prohibition, Plaintiffs are subject to irreparable harm in that they are unable to obtain handguns to protect themselves in their homes, subjecting them to endangerment from criminal intruders and violating their constitutional rights. As this Court is undoubtedly aware, the United Stated Supreme Court recently decided *District of Columbia v. Heller*, No, 07-290 (S. Ct. June 26, 2008) which struck down the District of Columbia's ban on handgun possession and held that the Second Amendment guarantees an individual's right to own a gun for self-defense. In light of the Supreme Court's recent ruling, plaintiffs challenge the constitutionality of the handgun prohibitions as well as the legality of such prohibitions in light of 18 U.S.C. §926A, the Firearms Owners' Protection Act ("FOPA").

Judge Aspen has stated the he "*freely confess[es] to a bias* in favor of the enactment of new federal gun control legislation." (Ex. 1, *Chicago Bar Record* article authored by Judge Aspen, p. 186, column 1) (emphasis added).[2] In an article published in the Chicago Bar Record, Judge Aspen voiced his opinion on the need for strong legislation banning handguns. (*Id.*, p. 186, column 2; p. 190, column 2.) Especially significant to the present case, Judge Aspen also spoke out against those who desire to obtain handguns for the defense of self and property. (*Id.*,

---

[2]  As noted in the *Chicago Bar Record* article at footnote 1, the article was "adapted from [ Judge Aspen's ] testimony before Congress."

p. 186, column 2.)  Referencing a Bob Greene column in the Chicago Tribune, Judge Aspen lamented the "widespread misconception that possession of a handgun is an effective means of home defense against a potential felon" (*Id.*, p. 186, column 1) and he challenged the "calculated exploitation of this misconception by some self-interest groups." (*Id.*, p. 186, column 1).  In the article, Judge Aspen devotes significant time to documenting what he views as the "harmful aspects to the widespread possession of handguns by the law-abiding citizens." (*Id.*, p. 188, column 2.)  His position on handguns is made clear in footnote three of the article where he states, "Handguns, which can be readily concealed, are designed, and for the most part used, for a single purpose: to shoot and kill people." (*Id.*, p. 191, footnote 3.)  He also suggests a dislike of those who, like the NRA, engage in lobbying efforts on behalf of gun owners.  Referring to the "loud advocacy of a handful of pistol-packing enthusiasts" (*Id.*, p. 191, column 1), he states: "I confess, too, that I never cease to be amazed that the overwhelming majority of Americans who favor [gun control legislation] are continually frustrated by a minority-interest gun lobby." (*Id.*, p. 186, column 1.)

## **Argument**

I.    **Recusal is Necessary Under §455(a) Because Judge Aspen's Impartiality Might Reasonably Be Questioned.**

Pursuant to §455(a), a judge should disqualify himself in any proceeding in which his impartiality might reasonably be questioned.  This provision is a "catchall recusal provision" which covers both "interest or relations and bias or prejudice grounds." *Liteky v. United States*, 510 U.S. 540, 548 (1994) (internal quotations omitted).  The Seventh Circuit recognizes that "[t]he standard in any case for a §455(a) recusal is whether the judge's impartiality could be questioned by a reasonable, well-informed observer." *In re Hatcher*, 150 F.3d 631, 637 (7th Cir. 1998).  This section "asks whether a reasonable person perceives a significant risk that the judge

will resolve the case on a basis other than the merits. This is an objective inquiry." *Hatcher*, 150 F.3d at 637 (citing *Hook v, McDade,* 89 F.3d 350 (7th Cir. 1996)). And, with respect to the "objective inquiry", courts recognize that "it is essential to hold in mind that these outside observers are less inclined to credit judges' impartiality and mental discipline than the judiciary itself will be." *In re Mason,* 916 F.2d 384, 386 (7th Cir. 1990). Disqualification should be granted when there is any doubt as to whether disqualification would be appropriate. *Parker v. Connors Steel Co.,* 855 F.2d 1510, 1524 (11th Cir. 1988).

In this case, a reasonable person would likely question Judge Aspen's impartiality. Considering Judge Aspen's published article and his admitted bias, a reasonable person could conclude that Judge Aspen favors handgun restrictions such as the one the Plaintiffs challenge here. And while Plaintiffs do not doubt that Judge Aspen is of the highest integrity, under §455(a) it "is not the reality of bias or prejudice, but its appearance" that is dispositive *Liteky, supra.* Here, Judge Aspen has done more than merely create an appearance of bias, he has expressly stated he has a bias in favor of federal gun control legislation. Judge Aspen also has suggested that he has a bias against those who seek handguns for self-protection, such as the individual Plaintiffs here, by arguing that such lawful gun possession creates more harm than good. (*See* Exh. 1.)

In determining whether recusal is appropriate under §455(a), courts also often consider the §455(b) categories. As set out below, Judge Aspen's recusal is also required under §455(b)(1) due to his bias and prejudice concerning a party. However, even were this Court to determine that Plaintiffs do not meet the requirements for a §455(b)(1) recusal, it must be noted that "affiliations that pose risks similar to those identified in §455(b) may call for disqualification

under §455(a)."  Thus, in light of the §455(b)(1) concerns noted below, recusal is that much more necessary under §455(a).

## II.     Recusal is Also Required Pursuant to §455(b)(1) Because Judge Aspen has a Personal Bias or Prejudice Concerning a Party.

Recusal is also required in this case, pursuant to §455(b)(1), because Judge Aspen has a personal bias or prejudice concerning a party.  This section states that recusal is necessary when a judge "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."  §455(b)(1).  In making a §455(b)(1) inquiry, "the question is whether the a reasonable person would be convinced the judge was biased." *Hook,* 89 F.3d at 355 (citing *Lac Du Flambeau Indians v. Stop Treaty Abuse-Wis.,* 991 F.2d 1249, 1255 (7th Cir. 1993)).  "The negative bias or prejudice from which the law of recusal protects a party must be grounded in some personal animus or malice that the judge harbors against him, of a kind that a fair-minded person could not entirely set aside when judging certain persons *or causes*." *Hook, supra.* (citing *United States v. Balistrieri,* 779 F.2d 1191, 1205 (7th Cir. 1985) (emphasis added)).  Finally, "bias against a litigant must, however, arise from an extrajudicial source." *Hook, supra.*

Judge Aspen's previous authored article, as well as his free confession of bias, clearly meet the standards for required recusal pursuant to §455(b)(1).  Judge Aspen's comment that he is amazed that an overwhelming majority of Americans have been frustrated by a "minority-interest-gun lobby" creates a reasonable inference that he harbors a bias against the NRA, one of the litigants in this action.  Likewise, Judge Aspen's statements regarding the harms he feels arise from individual gun ownership would cause a reasonable person to infer that Judge Aspen also is biased against the individual Plaintiffs.  As stated in the Complaint, Plaintiffs all desire to lawfully obtain handguns to keep at home for lawful self-protection.  (Complaint, ¶¶16, 18-20).

However, Judge Aspen has lamented "the widespread misconception that possession of handguns is an effective means of home defense against a potential felon. It also illustrates the calculated misconception by some self-interest groups." (Ex. 1). Judge Aspen's bias, real and perceived, against both the NRA and the individual Plaintiffs requires that he recuse himself from this case. *See, e.g., In re Acker,* 696 F. Supp. 591 (N.D. Ala. 1988) (recusal required because judge had bias in favor of Ku Klux Klan and against the Southern Poverty Law Center).

Finally, Judge Aspen's published comments also are extra-judicial because they were made outside the context of the courtroom and are evidence of bias and prejudice. *See, e.g., United States v. South Florida Water Management District,* 290 F. Supp. 2d 1356 (S.D. FL. 2003) (statements made by judge to newspaper would cause "a disinterested observer fully informed of the facts [to] entertain a significant doubt as to the judge's impartiality.") (internal citations omitted). The article in which Judge Aspen made the relevant comments was not published as part of any judicial proceeding and, as described above, evidences bias and prejudice against the NRA and the individual Plaintiffs.

## Conclusion

Judge Aspen is required to recuse himself pursuant to 28 U.S.C. 455(a) because his impartiality in this proceeding might reasonable be questioned. Additionally, recusal is required under 28 U.S.C. 455(b)(1) because Judge Aspen has a personal bias or prejudice concerning a party. In this case, and as evidenced by his published comments and freely confessed bias, Judge Aspen is biased in favor of handgun restrictions and against the Plaintiffs in this matter.

WHEREFORE, Plaintiffs respectfully request that Judge Aspen recuse himself from these proceedings.

Dated:  July 28, 2008                    Respectfully Submitted,

**NATIONAL RIFLE ASSOCIATION
OF AMERICA, INC., JONATHAN BLAIR
GARBER, ALAN L. MILLER and
KEVIN P. STANTON,**
Plaintiffs


BY:___ s/ William N. Howard_____
                    One of Their Attorneys

Local Counsel:
William N. Howard, Esq.
**FREEBORN & PETERS LLP**
311 S. Wacker Dr., Suite 3000
Chicago, Illinois  60606
(312) 360-6415

Stephen P. Halbrook, Esq.
10560 Main St., Suite 404
Fairfax, VA  22030
(703) 352-7276
(*Pro Hac Vice pending*)

# EXHIBIT "1"

# Two Judges Look at Gun Control

**By the Honorable David J. Shields***

The right to possess firearms, and particularly handguns, has become a controversial issue in our current society. The criminal laws now existent on these questions are generally prosecuted in a police court atmosphere, known colloquially in Chicago as the "Gun Court." The cases handled in the Gun Court are not generally those in which a gun is used in the commission of a crime, nor do they involve the felonious use of altered, sawed-off, automatic or repeating weapons. Almost all its cases involve the possession of handguns and the alleged violations of the various gun registration statutes and ordinances.[1]

The most common case handled is that known by the practicing attorneys as a "UUW" (Unlawful Use of Weapons). The one "use" contemplated is only possession, which, under Illinois law, becomes criminal when a gun is concealed from ordinary view and when the person in possession is not on his own property or fixed place of business.[2] This concealed possession is a criminal offense whether the gun is loaded or not.[3] Possession of a gun anywhere—except on the possessor's property or business—is unlawful if it is loaded, whether it is concealed or not.[4] For emphasis, and because of a widespread public misunderstanding in this area, it should be noted that it is a criminal offense to carry or possess a

---
*This article is adapted from the author's testimony before Congress.

gun in such fashion whether it is registered or not. Registration of a gun, or an individual as a gun owner, invests the registrant with no further authority whatsoever regarding the right to carry a gun under Illinois law. This fact is often misunderstood, and registration is the "defense" initially argued by most so-called good citizens when apprehended with a loaded gun in their possession or in their car.

The state of Illinois has not enacted a gun registration law, but it does require, by state statute, that an owner or possessor of a firearm be registered as such.[5] Very few municipalities in Illinois have enacted gun registration ordinances, but the city of Chicago has such an ordinance.[6] Every weapon of every kind must itself be registered in Chicago under the Municipal Code of Chicago and, until recently, any violation thereof called for a penalty ranging from a minimum fine of $100 to a maximum of $500. The Chicago City Council has recently enacted an amendment to the city code which calls for a mandatory and minimum ten-day jail sentence for violation of the registration ordinance.[7]

Very few cases have come to the Gun Court under this amended ordinance to date; there seems to be some ambiguity within its terms, suggesting that the mandatory aspect might apply only to persons ineligible to register a firearm. Although the legislative intent of the City Council seems to have

been in favor of a uniform and mandatory jail sentence, the ordinance will probably be selectively prosecuted until an appellate level interpretation of it can be obtained.

The primary area of contest in most gun cases is under the fourth amendment to the Constitution in the area of search and seizure. There is little argument directed to whether a gun found is in fact an operable gun or whether it is intentionally possessed. Constitutional search and seizure issues are probably more regularly argued in the Gun Court than anywhere in America. We have literally some several hundred cases on the call every day, and probably more than half of those contested begin with a motion to suppress evidence allegedly seized in violation of the defendant's constitutional protections. Most of the cases involve street stops, traffic stops, pat-downs, "stop and frisk," consent searches and the alleged complaints of unknown citizens. Without getting into the morass of law that attends these questions of search and seizure, particularly since the celebrated Robinson and Gustafson decisions in the U.S. Supreme Court, it should suffice to say that these arguments dispose of more contested matters than any others. Generally speaking, if the evidentiary motions are resolved against the defendant, the cases become pleas of guilty.

Among some other and customary defenses to gun charges, within the statute, are questions of accessibility and operability. A gun has to be immediately accessible to a defendant to sustain a conviction.[8] Accordingly, a gun in a case, in the glove compartment of a car, in a trunk, in a back seat,

or perhaps even under a front seat, may not be sufficient to sustain a prosecution,[9] nor is a gun that has been broken down or is disassembled to any material degree, nor a starter pistol or some other gun which is incapable of propelling a missile, competent to sustain a prosecution. In the registration area, if a defendant makes no admissions to the police regarding registration, a substantial burden is imposed on the prosecutor's office to prove up this failure of registration, as the testimony of any one other than the person charged with the actual registration responsibility about the existence of registration is hearsay.

In Illinois, another defense is employed—and, I think, abused—by so-called security guards. A security guard has authority to carry his gun to and from his work and is given one commuting hour in each direction to do so.[10] As you can imagine, particularly in such a high volume court, it is difficult for a prosecutor to refute the testimony of a licensed security guard, coupled with that of his purported supervisor, that he was on his way home from a watchman assignment at some remote industrial site, at some irregular hour of the night or early morning—particularly when the defendant has said nothing to the police officer at the time of the arrest to alert the prosecutor that such a defense might be presented. There is such a proliferation of security guards, special police and watchmen services, and such an abundance of stars, credentials and uniforms, that this entire area should have some closer legislative attention.

In no way do I mean to suggest that every defendant in the gun courts should not have these defenses avail-

181

JUDGE DAVID J. SHIELDS has been sitting on Chicago's "Gun Court" for some time. Before his appointment as an associate judge in 1971, he had been practicing law in Chicago for sixteen years and was a partner in the firm of Ryan, Condon & Livingston. He graduated from De Paul University Law School and is currently an instructor in litigation in various academic institutions and programs.



able to him. Most defendants are represented by competent counsel. Those who cannot afford private counsel have the services of a very able public defender's office which is aware of the cases in this specialized area. Recently the Chicago Bar Association has had a lawyer assigned to the court for referral purposes, and to avoid the always existent problem of solicitation by and for lawyers in the halls of the building. Very seldom does any person appear before the bench without a competent attorney.

As in all criminal courts, a defendant is entitled to ask for one continuance almost as a matter of law. By custom, the state is given at least that same courtesy. Further continuances are sought for various and obvious reasons and are addressed to the discretion of the court. Every defendant in a criminal case is entitled to a trial by a jury, unless he understandingly waives the jury trial. The Gun Court has no jury facility. The insistence by a defendant upon his right to a jury trial in effect

gives him another continuance, so the case may be transferred to a court with a jury facility, which is probably also backlogged. However, if the insistence on a jury trial is patently dilatory, the administrative offices of the court have made immediate juries available, and this threat has substantially lessened the number of spurious jury demands.

Evidence is sometimes tied up in the crime labs, particularly if the gun was stolen or was used in another incident. For countless valid reasons, cases get continued, witnesses and complainants get discouraged and frustrated and often refuse to further participate—so that, after several further state-continuances to get the complainants in, the cases are stricken from the call or dismissed.

In those cases that are tried on the merits, the convictions far exceed those discharged. Many are pleas of guilty, but, in view of the lawyers involved on both sides, very seldom, if ever, is there a blind plea. The cases are negotiated or plea-bargained; an agreed

We invite accounts of

GUARDIANS, CONSERVATORS, EXECUTORS & ADMINISTRATORS

Secure an excellent return and unquestioned safety by depositing in Talman where your fluctuation-free investments are insured up to $40,000. We pay interest from date of deposit to date of withdrawal.

Let us give you the facts by phone, letter, or in person at our main office, or at any of our convenient locations.



TALMAN
Federal Savings & Loan Association

One N. Wacker Dr., Chicago ■ 22 W 151 Butterfield Rd., Glen Ellyn ■ 10000 Skokie Blvd., Skokie ■ 6720 W. Roosevelt Rd., Oak Park ■ 1010 N. Meacham Rd., Schaumburg ■ 406 W. 111th St., Oak Lawn



184

disposition is proposed to the court for its approval and, when fairly negotiated, it is seldom disapproved. In past years, some defendants in selected cases were placed on court supervision. This meant that their cases were continued for specific lengths of time without disposition and then discharged if the defendant, usually a young person, didn't get into any further difficulty; this obviously avoided his having any criminal record. Such dispositions are no longer made of cases in the Gun Court. There are no orders of supervision whatsoever.[11]

Heretofore the customary minimum disposition on a case wherein the defendant was in court for the first time and found guilty has been one year on probation, a fine, usually $100, and the confiscation and destruction of his weapon. Unlawful Use of Weapons cases arising since October 1, 1975, however, are subject to a new and experimental minimum and mandatory jail sentence of at least one day in custody, in addition to the day of arrest.[12] This amendment providing for mandatory incarceration will be effective only for a two year period and is admittedly an experiment. Up to this point, before cases are presented under the new ordinance, the city registration violations have yielded additional monetary fines of not less than $100 per weapon. Anything of an aggravating nature in his background or the facts of the case would increase the penalties. Anyone with a conviction of a gun-related case in the prior several years would get a jail sentence, without exception. The probation given the first offender includes the usual impositions on his time and freedom, and is sometimes conditioned on periodic imprisonment,

participation in specified programs and other efforts at creative sentencing.

Jail sentences for second offenders in the Gun Court are the rule rather than the exception. A second concealed weapon charge or a charge arising within five years after a felony conviction or release from a penitentiary can be prosecuted as a felony.

Probably the most striking experience that one takes away from Gun Court is awareness of the kinds of people who appear there as defendants. For most, it is their first arrest, many are old people. Shopkeepers, persons who have been victims of violent crimes and others who carry guns because of a sincere belief in their need for protection—these constitute the greatest part of the call. Their attitude is probably best summed up by an elderly defendant in a recent case. Asked why he carried a gun when he knew it was against the law, his response was, "I'd much rather be caught by the police with a gun than be caught out on the street in my neighborhood without one."

Most readers of this article would not go into ghetto areas except in broad daylight under the most optimum circumstances—surely not at night, alone or on foot. But some people have no choice. To live or work or have some need to be on this "frontier" imposes a fear which is tempered by possession of a gun. The very argument most gun advocates advance, that of self-protection, is certainly much more appropriate in the black community of Chicago than in the isolated suburbs, in which it is usually heard. The judiciary is seriously concerned about putting someone in a ghetto area on probation,

because one condition of probation is that the offender cannot have a weapon during the probationary period—yet if he follows the law, he is without protection in his home or store or on the streets of his community.

These remarks, admittedly subjective, are being made to put the role of the courts on the gun problem into proper perspective. A police court should not make the law, nor should it enforce the law. It should be a forum to determine whether the law enforcement authorities have acted within the bounds of propriety. The enactment of absolutes, the total abolitions, the mandatory sentences, the harsh penalties are laudable for their intent, but they must be enforced in a humane atmosphere. The constitutional defenses, the rules of evidence, the ingenuity of the bar and all the nuances of the adversary system will always be available to an accused, whatever the charge.

While this writer, personally and as a citizen, advocates a uniform ban on the sale or manufacture of handguns and the eventual exclusion of guns from our society as a simplistic answer to the problem, he recognizes that the courts have to follow the law. It is sincerely believed that legislation to ban firearms from society would have little real effect upon the problem; it would, in fact, criminalize a substantial number of persons who are not part of the problem. Although the usual criticisms can be expected, the conscientious application of the law by competent jurists, using severity when appropriate, would seem more likely to contribute to the concept of uniform justice.

FOOTNOTES

1. General Orders of Municipal Dept.-Circuit Court of Cook County, Illinois (General Order 75-8(M); General Order 75-9(M).

2. Ill. Rev. Stat., ch. 38, §24-1(10). See People v. Graham, 22 Ill. App. 3d 685; See People v. Graham, 23 Ill. App. 3d 685; People v. Colson, 111 Ill. App. 2d 77; People v. Colson, 111 Ill. App. 2d 77; N.E.2d 409 (1st Dist. 1973); People v. Grant, 57 Ill. 2d 264, 312 N.E.2d 276 (1974); People v. Boose, 9 Ill. App. 3d 393, 292 N.E.2d 444 (1st Dist. 1972); People v. Taylor, Ill. App. 3d 186, 328 N.E.2d 24 (1st Dist. 1973).

3. People v. Scroggins, 8 Ill. App. 3d 289, 276 N.E.2d 464 (1st Dist. 1971).

4. Ill. Rev. Stat. ch. 38, §24-1.(a)(10)

5. Ill. Rev. Stat. ch. 38, §83-2(a) (1973).

6. Municipal Code of Chicago ch. 11.1, §§11.1-15 through 11.1-18 (1975).

7. Municipal Code of Chicago ch. 11.1, §11.1-16: "A person may not conceal any firearms, whether concealed or not concealed, if such person is ineligible to register such firearms with the licensing authority pursuant to the provisions of this Chapter and any provision of unregistered firearms by any person shall be a misdemeanor."

8. §11.1-17: "Any person who violates any of the sections of this Chapter shall upon conviction thereof be punished by a fine of not less than $100.00 nor more than $500.00 for the first offense and not less than $500.00 nor more than $500.00 for the second and shall be punished as a misdemeanor in the county jail for a term not to exceed six months, or by both; and subsequent offense by incarceration in the county jail for a term not to exceed six months, or by both the procedures set forth in Section 1-2-1.1 of the Municipal Code as amended, however, that any violation of Sinson, shall be a misdemeanor punishable by imprisonment in the county jail for a term not less than ten days and not to exceed six months."

9. People v. Bastian, 19 Ill. App. 3d 773, 312 N.E.2d 795 (1st Dist. 1974); People v. Zinzzett, 6 Ill. App. 3d 858, 286 N.E.2d 795 (1st Dist. 1972); People v. Adams, 73 Ill. App. 2d 1, 220 N.E.2d 17 (1st Dist. 1962) (1973).

10. Ill. Rev. Stat. ch. 38, §24-2(b), (Supp.

11. There is no statutory authority for this statement, but it has been a matter of policy agreed upon, by and between the judges sitting in the Gun Court since January 1, 1976.

12. Ill. Rev. Stat. ch. 38, §§24-1(b), 1005-5-3(a)(3), 1005-8-1(a)(1) (Supp. 1975).

185

186

**By the Honorable Marvin E. Aspen:**

"Wonderful news from the corner drugstore: an exciting and informative new magazine has just hit the racks and is available all across the country.

"The magazine is called 'Guns for Home Defense.' It is published by the same company that puts out 'Guns and Ammo' magazine, and it marks a breakthrough in the literature of firearms. While in the past, publishers of gun magazines have always claimed that they really were only providing a service for 'sportsmen,' those hardly adventurers who like to kill animals, this new publication finally comes right out and says it: The magazine is designed for people who want to know how to shoot other people."[2]

The above quote from Bob Greene's recent column in the *Chicago Sun-Times* highlights the widespread misconception that possession of handguns is an effective means of home defense against a potential felon. It also illustrates the calculated exploitation of this misconception by some self-interest groups.

I have been interested in handgun control legislation for many years—as prosecutor, as draftsman of several legislative 'gun control' proposals, and over the past four years as a judge assigned to the Criminal Division. There, I freely confess to a bias in favor of the enactment of new federal gun control legislation. I confess, too, that I never cease to be amazed that the overwhelming majority of Americans who favor such legislation[1] are continually frustrated by a minority-inter-

Rather than recite what I believe to be the overwhelming and convincing statistical data showing the cause and effect relationship between the availability of handguns and the increase in crime,[3] I will attempt to dispose of one emotional and frequently recited myth created and propounded by gun control opponents.[4] The myth goes something like this: "Gun control legislation will disarm the law-abiding citizen, leaving him the helpless prey of the crook, who will not be affected by that legislation."

My response to this contention, although statistically supportable, is based primarily upon my courtroom observations over the past four years, where more than a thousand accused felons have appeared before me for trial.

I do not contend that the enactment of a federal ban on handguns will be an immediate panacea for our spiraling crime rate. However, I do believe that a strong federal gun control bill will —in the long run, not overnight—disarm the criminal. State and local legislation, in my opinion, has been, and will continue to be, ineffective. Finally, I also believe that the law enforcement needs of the law-abiding citizen are not best served by possession of a firearm.

Restricting or banning the sale and possession of handguns to the general public will have, I believe, a tangible effect on the rate of criminality. First, such legislation would create an absolute liability crime for which to charge the criminal who is caught in possession of a handgun; this alone is bound to aid law enforcement. But

# ARE YOU A THINKER?

IF YOU ARE, you will want to study the Chicago Bar's NEW Group Life Program . . .

DEFENDER'S COVERAGE

BIGGER BENEFITS

NEW GROUP LIFE PROGRAM

New association members under 40 years of age will be assured of one $10,000 unit of insurance regardless of their past or present health condition providing they apply within 61 days after becoming a member of the Chicago Bar Association. Dependents insurance if applied for, will be issued regardless of their past or present health conditions upon acceptance of the member's application.

**EVIDENCE OF INSURABILITY WAIVED**

*The plan is administered by*

**MODERN ADMINISTRATORS, INC.**
P.O. Box 253, South Holland, Illinois 60473

187

188

more important, restricting the import and interstate sale of handguns will dry up the potential arsenal readily available at the local gun shops to the criminal and the potential criminal's arsenal. It is my impression that a significant number of handguns used in crimes are taken in burglaries from the homes and businesses of law-abiding citizens. This impression is supported by responsible research, which shows that 500,000 guns are stolen every year from homes and businesses. Therefore, it is clear to me that the criminal, whether or not he initially turns in his handgun, will in the long run, be adversely affected by the proposed federal legislation.

Next, it is important to analyze what, if any, law enforcement or self-defense good would be undermined by disarming the general public. Far more weapons kept by citizens for self-defense are in fact eventually used for purposes of crime rather than for self-defense. The statistics are clear that significantly more weapons purchased for home protection are eventually used by the purchaser in a "heat of passion" shooting, in a suicide, in an accidental shooting, or are stolen from him and used to perpetrate a crime rather than to prevent one. These same statistics also show that the armed citizen is more likely to be shot by a felon than the unarmed victim. Every judge and law enforcement officer knows of numerous instances where the handgun of a law-abiding citizen was taken away from him and used against him by a criminal. No responsible law enforcement officer

would argue that weapons in the private sector have been significantly effective in combating crime. On the contrary, weapons in the private sector pose a constant threat to the law-abiding citizen.

There are other well-documented harmful aspects to the widespread possession of handguns by the law abiding citizens.

In my courtroom I have seen countless murder and aggravated battery cases which began with a domestic quarrel and escalated into a killing or attempted killing because of the availability of a firearm. Statistics show that almost three out of four murders evolve out of domestic quarrels or quarrels between persons who know one another. In Chicago in 1974, for example, 525 out of 970 murder victims knew their murderers as relatives, friends or neighbors. Three-quarters of all murderers have never broken the law before.

In most of these murder cases, I am convinced that if no handgun had been available in the apartment or home, we would be dealing, at the very worst, with broken bones or knife wounds rather than with lost lives. For example, a spontaneous knife-wielder is only 20 percent as fatal as a gun shooter; since the use of a knife requires considerably more strength, agility and skill than the use of a gun. Therefore, the argument that people would find other ways to kill each other if guns were not available just does not hold water.

The accident rate with handguns is equally significant. How many times this past year have we picked up a newspaper and read of the tragedy of a child discovering a supposedly

# TAKE ADVANTAGE OF YOUR MEMBERSHIP

## IN THE CHICAGO BAR ASSOCIATION

### Investigate the Savings of the 5 GROUP PLANS AVAILABLE

**1. THE GROUP DISABILITY PLAN—**
Provides up to $1,732.00 monthly in the event of disability caused by Sickness or Accident. A sickness plan to age 65 is available.
★ A special rate reduction for those under age 35.

**2. THE BASIC MAJOR MEDICAL EXPENSE PLAN—**
In or out of Hospital Benefits up to $25,000.00 per Disability. Up to $100.00 Gross Daily Hospital Room and Board maximum. Subject to choice of deductible and 80% coinsurance.

**3. EXCESS MAJOR MEDICAL PLAN—**
Covers up to $300,000 for Medical Expenses. Supplements any Major Medical Plan and is available with a $15,000, $20,000, or $25,000 Deductible. Truly catastrophic coverage.

**4. EXTRA CASH—IN HOSPITAL PLAN—**
Ideal supplement to any Basic Hospital or Major Medical Plan. Liberal pre-existing clause. Up to $50.00 daily in-hospital benefit insurance. Benefits paid direct to you regardless of other medical insurance.

**5. THE GROUP ACCIDENTAL DEATH AND DISMEMBERMENT PLAN—**
A 24 hour world wide accident plan. Includes all travel accidents.
★ Your Wife and Children and your Employees are also eligible
★ Low annual cost—80¢ per person.

YOUR EMPLOYEES ARE ALSO ELIGIBLE TO APPLY.

Write or Telephone Today!

PIERCE ALEXANDER & COMPANY
Professional Administrators

9933 Lawler Ave., Skokie, Ill. 60076  •  Telephone (Skokie) 673-1000

189

secreted handgun and accidentally shooting and killing a brother, sister or another child? There are 3,000 accidental deaths by firearms each year, and one-fourth of the victims are children 13 years of age or younger.[11] Consider also that for every individual who is stopped by a home-owner with a gun, there are four accidental shootings, caused either by mistaking the weapon or by mistaking an innocent person for a criminal.[13]

Again: no nation in the world has firearms suicide rate higher than ours. Guns are used in half of all the suicides in the United States;[19] about 10,000 people shoot and kill themselves each year.[20] I am not suggesting that an individual who truly wishes to take his life will be deterred by the unavailability of a firearm. But must wonder how many spur-of-the-moment suicide attempts by depressed and troubled individuals might have been avoided if, at that particular moment, no firearm was available. Or

think of the attempts at suicide in which means other than firearms were used—how many lives might have been saved by stomach pumps, artificial respiration, and other first aids! How many victims could have survived if they had not resorted to the finality of a bullet to the head!

To reiterate, it is my opinion that federal legislation banning or restricting the sale, manufacture and possession of handguns to persons other than law enforcement officers[21] will, in the long run, disarm the criminal; and that the law-abiding citizen, when all considerations are balanced, has much to gain and very little to lose by this legislation.

I believe the handgun problem in this nation has reached crisis proportions. There are an estimated forty million handguns now in the United States—a number growing by 2.5 million each year.[22] We can no longer avoid coming to grips with the over-



JUDGE MARVIN E. ASPEN has served for more than four years in the Criminal Division of the Circuit Court of Cook County. He is a part-time faculty member at the Northwestern University School of Law, and is serving as chairman of the Advisory Board of the Institute for Criminal Justice of the Illinois Institute of Technology. Judge Aspen has authored three legal texts as well as articles in numerous legal periodicals, and has chaired several bar association committees. He is currently serving on the Board of Editors of the *Chicago Bar Record.*

whelming statistical evidence that increasing the promiscuous proliferation of handguns in our country. Ignoring the problem will not make it go away. It will get worse. We should not mortgage the public safety of this nation by ignoring the desires of an overwhelming majority of our citizens for responsible federal gun control legislation because of the loud advocacy of a handful of pistol-packing enthusiasts who view any federal action[23] as unacceptable, no matter how great the public need.[24]

**Footnotes**

1. This paper, adapted from the author's testimony before Congress, does not purport to be a definitive discussion of gun control legislation, of the pros and cons regarding such legislation. Rather it is an attempt to turn the perspective of the bench, to present frequently proffered arguments against gun control legislation.

2. Chicago Sun-Times, Jan. 25, 1976, at 10, col. 1.

3. It is important to define the scope of the proposed legislation. I am not advocating disarming of all firearms, only handguns. Rifles and shotguns have legitimate sporting and hunting purposes. Handguns which can be readily concealed are designed, and for the most part used, for a single purpose: to shoot and kill people. As the proposed legislation before the Subcomm. on Crime of House Comm. on the Judiciary, 94th Cong., 1st Sess. (1975) [hereinafter cited as *Hearings*]. These hearings were in New York, Washington, Chicago. Every public opinion poll on handguns shows that an overwhelming majority of Americans favor strong controls. *Hearings on Firearms Legislation Before the Subcomm. on Crime of House Comm. on the Judiciary*, 94th Cong., 1st Sess. (1975) [hereinafter cited as single Part]. These hearings were April 14, 1975, during congressional... April 16, 20, 27, March 5, 6, 13, 20, 26 (Washington). Part 2 (Chicago), April 14 and 15, Part 3 (Cincinnati, June 9 and 10), Part 4 (Cleveland, June 16), Part 5 (Denver), June 26 (Boston), Part 6, Part 7 (New York, July 15, Part 8 (Washington). See also Hazel Erskine, *The Polls: Gun Control, Public Opinion Quarterly*, 23, 24, September 24 and October 14, July 17, 1975. See also 39 Pub. Opinion Q. (1975), at 10. The Gallup Poll, Field Newspaper Syndicate, Chicago, Illinois, June 5, 1975.

5. DRAKE & ALVIANI, HANDGUN CONTROL, 1975 [United States Conference of Mayors], at 7 [hereinafter cited as DRAKE].

6. Massachusetts Council on Crime and Correction, Inc., *A Shooting Gallery Called America* (1975) [hereinafter cited as Mass. Council]. See also DRAKE, supra note 5 at 1.

7. Al... see also DRAKE, supra note 5 at 8. There is a third argument, voiced by gun control opponents. It is phrased in two ways: (a) gun control is a local responsibility, (b) it is the federal government should keep hands off, and (c) local gun control laws do not work, and/or (d) federal laws the answer to both sides. The argument is to some: local gun control is not working because of the ready availability of out-of-state weapons, and the answer is that local law is precisely why a federal law is needed. In addition, national registration of all firearms. Testimony on April 1975 Hearings, supra note 4. Richard J. Daley of Chicago and his Special Assistant for Gun Registration, Francis T. Kane.

8. In support of the foregoing, a recently completed study by the Federal Bureau of Alcohol, Tobacco and Firearms concluded that strict local control laws are not effective in keeping control laws out of the hands of criminals because of the ability to obtain guns from other states or localities that have lax laws. Chicago Sun-Times, Feb. 1, 1976. In addition to weapons purchased by individuals, over 40,000 weapons are stolen from dealers and shipments from manufacturers to dealers annually. *Hearings on The Escalating Rate of Firearms Thefts Before the Subcomm. on Juvenile Delinquency of the Sen. Comm. on the Judiciary*, 94th Cong., 1st Sess. (1975). Congressional testimony of Rex D. Davis, Director of Bureau of Alcohol, Tobacco and Firearms, 1975. See also 1975 Hearings, supra note 4.

9. Lindsay, *The Case for Federal Firearms Control*, The Criminal Justice Coordinating Council (New York City, 1973).

10. DRAKE, supra note 5 at 8.

192

11. NEWTON & ZIMRING, FIREARMS AND VIOLENCE IN AMERICAN LIFE (1969) [hereinafter cited as NEWTON].

12. See remarks of Chicago Superintendent of Police James M. Rochford before the Chicago City Council Committee on Police, Fire, Civil Service, Schools and Municipal Institutions on October 11, 1974. In July 1972, "Gun Controls" Gain, Oakland Chief of Police, testified...

13. FBI Uniform Crime Statistics (1972).

14. Chicago Police Department Statistics (1974).

15. Lindsay, supra note 9.

16. NEWTON, supra note 11 at 44.

17. NEWTON, supra note 11 at 44.

18. BAKAL, NO RIGHT TO BEAR ARMS (1968).

19. Lindsay, supra note 9. See also NEWTON, supra note 11 at 64.

20. Miss. Council, supra note 6 at 4.

21. Id.

21. Proposed federal gun control legislation would exempt from its provision groups in addition to the police. These would include the military, private licensed security officers, antique dealers, and pistol clubs where guns would be kept on the premises under secure conditions.

22. Chicago Daily Law Bulletin, April 7, 1975, at 1, col. 3.

23. On February 9, 1976, the House Judiciary Committee, by a 25-8 vote, killed federal legislation that would have imposed a nation-wide ban on all handguns except for those gun clubs, Chicago Daily Law Bulletin, February 10, 1976, at 1, col. 5. On February 17,

1976 the same committee defeated by an 18-10 vote, a proposed handgun registration act. Chicago Tribune, February 18, 1976, Sec. 1, at 5, col. 1. On February 27, 1974, this same committee voted 18-14 to ban the sale, manufacture and importation of small, easily concealable handguns such as "Saturday night specials," Chicago Daily Law Bulletin, February 24, 1974, at col. 4. The prognosis for passage before the House, however, is poor. Undoubtedly, if ultimately unsuccessful as to passage in the current session, the same types of gun control legislation will be offered again in the next session of Congress.

24. Judge Shields in his companion article concludes that "legislation to ban handguns from society would have little effect upon the [crime] problem; it would, in fact, criminalize a substantial number of persons [otherwise law-abiding citizens] who carry handguns for personal protection" who are not the problem. I, of course, disagree, with the premise that banning handguns would have little effect on crime. As to his second premise, stated in this article, that the otherwise law-abiding citizen within the enforcement of gun control laws would share the sanctions of the criminal justice system for these individuals. However, the concern for the first of these ought to be abolished. Shortly thereafter, the only effective manner of drying up handguns in society would be to apply any proposed law uniformly and fairly. This does not mean that I either has a "good citizen" first-time gun offender in his courtroom should put him in jail or otherwise "throw the book" at him. It does mean that I would "cannot" and should not give such a person a "non-pass" and refuse to convict under a proposed federal law banning handguns.

# Consumer Redress and the FTC

## By Raymond J. Jast

Not too long ago the Federal Trade Commission was affectionately known around the nation's capital as the "Little Old Lady of Pennsylvania Avenue." But the original Nader's Raiders, after examining the Commission, concluded it was so ineffective in fulfilling its antitrust and consumer protection missions that unless it was going to be completely redirected it ought to be abolished. Shortly thereafter, a blue ribbon panel formed by the American Bar Association issued a report which echoed the Nader study by recommending that the Commission either be reformed or quietly be put to rest.

The Commission's "Little Old Lady" label of the 1960's, however, has since given way to a new reputation—that of being an aggressive law enforcement agency. This newly acquired tough-guy image has been earned, in part, by its efforts to develop remedies on the consumer protection front which go beyond the simple "go and sin no more" cease-and-desist order. In recent years, the Commission has explored such novel relief measures as corrective advertising, contract reformation and restitution as means of putting teeth into its cease-and-desist orders. I think it is fair to say that, notwithstanding the Commission's recent decision on corrective advertising in the Listerine case,[1] restitution has

emerged as the most important of the novel remedies and the one which will be most significant in the future.

The pioneer case in the restitution area was the Commission's 1971 decision in Curtis Publishing.[2] Although the Commission did not ultimately order Curtis to refund money to subscribers of the defunct Saturday Evening Post, the opinion written by Commissioner Dixon stated that the Commission believed itself to be possessed of such power. The question of whether it had the authority to order a party to refund monies gained through unfair or deceptive trade practices finally came to a head in FTC v. Heater.[3] There the Ninth Circuit held that, while the Commission could order a party to cease and desist from using unfair or deceptive acts or practices, it could not also order restitution of the money obtained through such conduct. Although sympathizing with the Commission's desire to prevent wrongdoers from escaping with their ill-gotten gains, the court said it was up to Congress to provide the kind of remedial power. The Ninth Circuit's Heater opinion came down in September 1974, and by the time the following New Year's Eve hangovers had finally disappeared, Congress had in fact stepped into the breach.

In what has been described as "one

193

152

14. 50 Ill. 2d 136, 277 N.E.2d 878 (1972).
15. Ill. Rev. Stat. ch. 111¾, § 73 (1973).
16. Ill. Rev. Stat. ch. 15½, § 22.69 (1973).
17. Ill. Rev. Stat. ch. 32, § 157.148 (1973).
18. Ill. Rev. Stat. ch. 48, § 137.7-16 (1973).
19. Ill. Rev. Stat. ch. 102, § 16 (1973).
20. Ill. Rev. Stat. ch. 73, § 802 (1973).
21. Ill. Rev. Stat. ch. 46, §§ 6-47 and 6-52 (1973).
22. Ill. Rev. Stat. ch. 57, § 19 (1973).
23. Ill. Rev. Stat. ch. 120, §§ 382, 386 (1973).
24. Ill. Rev. Stat. ch. 120, § 718 (1973).
25. Ill. Rev. Stat. ch. 120, § 619 (1973).
26. Ill. Rev. Stat. ch. 120, § 432a (1973).

27. Ill. Rev. Stat. ch. 120, § 372.4 (1972).
28. Ill. Rev. Stat. ch. 4, § 9.1-20 (1973).
29. Ill. Rev. Stat. ch. 48, § 172.54 (f)(2) (1973).
30. Ill. Rev. Stat. ch. 15½, § 68.18 (1973).
31. Ill. Rev. Stat. ch. 133, § 14 (1973).
32. Ill. Rev. Stat. ch. 34, §§ 9-2-115, 9-2-120, 34, §§ 2715, 2743 (1973). See People v. Taylor, 50 Ill. 2d 136, 277 N.E.2d 878 (1972); People v. Jones, 41 Ill. 2d 62, 66, 327 N.E.2d 495, 498 (1968).
33.
34. Ill. Rev. Stat. ch. 37, § 705.3 (1973).
35. Ill. Rev. Stat. ch. 37, § 704.8 (1973).
36. Ill. Rev. Stat. ch. 7, Title and § 6 (1973).
37. Ill. Rev. Stat. ch. 59, § 13 (1973).
38. Ill. Rev. Stat. ch. 87, § 2 (1973).

**CLASSIFIED AD**

Young attorney is interested in employment with Chicago law firm or corporation. Master's degree in international business. Bilingual in Spanish and English. Write Apartment 1E, 613 Hinman Avenue, Evanston, Illinois 60202.

Classified ads are now being taken for publication in the Chicago Bar Record. Individuals or organizations interested in classified advertising may telephone Lorie J. Nies at the Chicago Bar Association headquarters, 312/782-7348. So call today!

Volume 57 No. 4

**OFFICERS**

John Cadwalader Menk, President
Kenneth C. Prince, First Vice President
Esther R. Rothstein, Second Vice President
David C. Hilliard, Secretary
James E. Caldwell, Treasurer
P. Oznon, Librarian

**BOARD OF MANAGERS**

James P. Connelly
Herbert Barsy
Arthur L. Berman
Philip M. Citrin
Kevin J. Gillogly
James L. Harris
George Keim
Eugene L. Wachowski
Richard W. Austin
William M. Gibbons
Arthur I. Grossman
John D. Hayes
Thomas Z. Hayward, Jr.
Leonard T. Neal

**BOARD OF EDITORS**

Kevin M. Forde, Editor-in-Chief
Marvin E. Aspen
Suzanne B. Conlon
Julian Conroy Haney
Gordon Henry
Robert E. Levin
Henry L. Mason III
Arthur M. Martin
Francis D. Morrissey
William R. Quinlan
George J. Nies, Assistant Editor

**SENIOR STAFF**

Terence M. Murphy, Executive Director
John F. McBride, General Counsel
Terry McCarthy, Continuing Legal Education
Helen Czike, Assistant Secretary
Pauline Ash, Executive Librarian
Frances Engelbrecht, Dining Rooms / Office Manager

# chicago bar record



published bimonthly by
The Chicago Bar Association
29 South LaSalle Street,
Chicago, Illinois 60603

As its official publication this magazine carries authoritative information about the activities of The Chicago Bar Association. Neither the Association nor the Editors, however, assume responsibility for statements or expressions of opinion by contributors.

Single copies $1.00, $4.50 per year
Copyright © 1976 by
The Chicago Bar Association
All Rights Reserved
Second-Class Postage Paid at Chicago, Illinois

## Contents

President's Page
John Cadwalader Menk ............ 154

Footnotes and Dicta
Kevin M. Forde ............ 156

Comments on Current Problems Facing the Legal Profession (Part II)
Justin A. Stanley ............ 159

Immunity, Right or Wrong? Right!
The Honorable Samuel K. Skinner ............ 168

Immunity, Right or Wrong? Wrong!
The Honorable Warren D. Wolfson ............ 174

Two Judges Look at Gun Control
The Honorable David J. Shields ............ 180
The Honorable Marvin E. Aspen ............ 185

Consumer Redress and the FTC
Raymond J. Jast ............ 193